DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CABN 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:   (202) 307-6422
Fax:             (202) 307-0054
E-mail:  Amy.T.Matchison@usdoj.gov
              Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN THE MATTER OF THE TAX, LIABILITIES OF: | ) ) ) | Case No. |
| JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "SFOX"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2021. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **UNITED STATES' MEMORANDUM IN SUPPORT OF EX PARTE PETITION FOR LEAVE TO SERVE "JOHN DOE" SUMMONS** |

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION .................................................................................. 1

II.    BACKGROUND ................................................................................... 2

       A  "Cryptocurrency" Defined ........................................................... 3

       B.  Tax Treatment of Cryptocurrency Transactions ........................... 4

       C.  Information Regarding Cryptocurrency Transactions Held by SFOX .............. 5

       D.  Grounds for the IRS's Belief that Virtual Currency Transactions Are
           Not Being Properly Reported ...................................................... 8

            1.   Suspected Tax Non-Compliance by SFOX Users ................. 8

            2.   The Lack of Third-Party Reporting to the IRS ..................... 13

            3.   The John Doe Summons to Coinbase, Inc., and Its Aftermath ............... 15

III.   LAW AND ARGUMENT ..................................................................... 17

       A.  Governing Law ........................................................................... 17

       B.  Application of § 7609(f) .............................................................. 20

            1.   The Summons Relates to the Investigation of an Ascertainable
                 Class ................................................................................... 20

            2.   There Is a Reasonable Basis for Believing that the John Doe
                 Class May Fail, or May Have Failed, to Comply with the
                 Internal Revenue Laws ....................................................... 23

            3.   The Information Sought in the Summons Is Not Readily
                 Available from Other Sources ............................................. 28

            4.   The Summons Is Narrowly Tailored to Information that Pertains
                 to the Failure (or Potential Failure) of the Class to Comply
                 with the Internal Revenue Laws ......................................... 31

IV.    CONCLUSION .................................................................................. 33

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Does*, 671 F.2d 977 (6th Cir. 1982) ....................................................................25

*In re John Does*, No. 02-22404.................................................................................27

*In re John Does*, No. 03-22177.................................................................................27

*In re John Does*, No. 04-21986-CIV-UNGARO-BENAGES (S.D. Fla. 2004)......27

*In re John Does*, No. 04-F-1548 (OES) (D. Colo. 2004) ........................................27

*In re John Does*, No. 1:00-CV-3919, 2000 WL 34538137 (S.D. Fla. Oct. 30, 2000) ......................................................................................................27, 30

*In re John Does*, No. 4:04-cv-94-1 (CDL) (M.D. Ga. 2004) ..................................27

*In re John Does*, No. CV-02-0049-MISC-PJH (N.D. Cal. 2002) ..........................27

*In re Tax Liab. of Does*, No. 03-22793-CIV, 2003 WL 22953182 (S.D. Fla. Oct. 30, 2003) ...................................................................................22, 29

*In re Tax Liab. of Does*, No. 2:10-mc-00130-MCE-EFB, 2011 WL 6302284 (E.D. Cal. Dec. 15, 2011) ................................................................................22

*In Matter of Tax Liabilities of Does*, No. 3:96-CV-25(DF), 1996 WL 196633 (M.D. Ga. Feb. 5, 1996).................................................................................23

*In re Tax Liability of John Does*, No. 21-cv-02201-JCS, 2021 WL 2314968 (N.D. Cal. May 5, 2021) .............................................................................*passim*

*In re Tax Liabs. of Does*, 688 F.2d 144 (2d Cir. 1982) ..........................................24

*In re Tax Liabs. of Does*, No. 11-cv-01686-PJH, Dkt. No. 10 (N.D. Cal. Apr. 7, 2011) ........................................................................................................29

*In the Matter of the Tax Liabilities of John Does*, No. 21mc91201-RGS, 2021 WL 2291031 (D. Mass. Apr. 1, 2021)................................................*passim*

*Matter of Does*, No. CV-13-3393 YGR, 2013 WL 5503135 (N.D. Cal. Aug. 29, 2013) ......................................................................................................22

*Sugarloaf Funding, LLC v. U.S. Dept. of Treas.*, 584 F.3d 340 (1st Cir. 2009) ................................................................................................30

*Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310 (1985)................................19

*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984)....................................18

*United States v. Bell*, 57 F. Supp. 2d 898 (N.D. Cal. 1999) ...................................18

*United States v. Berkowitz*, 488 F.2d 1235 (3d Cir. 1973) .....................................30

*United States v. Coinbase, Inc.*, No.17-cv-01431-JSC, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017).........................................................................15, 16

*United States v. Ernst & Whinney*, 750 F.2d 516 (6th Cir. 1984) ..........................19

*United States v. Euge*, 444 U.S. 707 (1980) ..........................................................18

*United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995).............................................19

*United States v. Island Trade Exchange, Inc.*, 535 F. Supp. 993 (E.D.N.Y. 1982) .................................................................................................26

*United States v. John Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal. Nov. 30, 2016) .................................................................................15, 22, 29

*United States v. John G. Mutschler & Assocs., Inc.*, 734 F.2d 363 (8th Cir. 1984) .................................................................................................30

*United States v. Jose*, 131 F.3d 1325 (9th Cir. 1997)..............................................18

*United States v. Pittsburgh Trade Exchange, Inc.*, 644 F.2d 302 (3d Cir. 1981) .................................................................................................26

*United States v. Powell*, 379 U.S. 48 (1964) ..........................................................32

*United States v. Reprints, Inc.*, 43 A.F.T.R.2d 79-463, 1978 WL 1238 (N.D. Ga. Nov. 18, 1978).........................................................................30

*United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994)..............................................24

**Statutes**

26 U.S.C. §§ 1, 61, 451, 1011, 1211, and 1222 ............................................. 4, 23, 31

26 U.S.C. § 7601(a) ......................................................................................... 17, 18

26 U.S.C. § 7609(a)(1) ........................................................................................... 18

26 U.S.C. § 7609(f) ......................................................................................... *passim*

26 U.S.C. § 7609(h)(2) ...................................................................................... 1, 18

26 U.S.C. § 7610 ..................................................................................................... 18

26 U.S.C. § 7701(a)(30) ......................................................................................... 21

**Other Authorities**

31 C.F.R. § 1010.100(ff) .......................................................................................... 6

31 C.F.R. § 1010.410 ................................................................................................. 7

31 C.F.R. § 1022.210 ................................................................................................. 7

H.R. 1957 ................................................................................................................ 32

H.R. Rep. No. 94-658 (1975) .................................................................................. 24

H.R. Rep No. 116-39 (2019) ................................................................................... 32

Taxpayer First Act, Pub. L. No. 116-25, § 1204(a) ............................................... 32

The United States of America submits this memorandum in support of its ex parte petition for an order approving the service of an Internal Revenue Service John Doe summons on Ox Labs Inc. and Subsidiaries (collectively, "SFOX").  A copy of the summons and summons attachment (listing the items requested) are filed herewith, as well as a proposed order, Declaration of IRS Senior Revenue Agent Seng Tchong Lee (hereinafter "Declaration") and supporting exhibits.

## I.   INTRODUCTION

The proposed summons is sought to be served in furtherance of an ongoing investigation by the IRS to determine the identity and correct federal income tax liability of U.S. persons who have conducted transactions in cryptocurrency (defined below).  *See* Declaration ¶¶ 3, 8, 33.  Transactions in cryptocurrency have grown substantially in recent years, and the IRS is concerned that taxpayers are not properly reporting these transactions on their tax returns.  The summons seeks account and transaction records from SFOX that are expected to aid the IRS's investigation.

The summons is a so-called "John Doe" summons because it does not identify the persons with respect to whose liabilities the summons is issued.  *See generally* 26 U.S.C. § 7609(f).  The government therefore must obtain court approval prior to serving the summons.  *Id*.  As discussed below, the statutory criteria for court approval of a John Doe summons are met.

Pursuant to 26 U.S.C. § 7609(h)(2), a court's determination whether a John Doe summons may be served is to be made ex parte based solely on the petition and

supporting affidavits.  The pleadings filed in this proceeding will therefore not be served

upon any person or entity, and no other filings are permitted from other persons or

entities.  The United States respectfully asks the Court to review the petition and

supporting documents and enter the proposed order at the Court's earliest opportunity.

## II.  BACKGROUND

The summons seeks account and transaction records from SFOX regarding a group

of its users whose identities are not known to the IRS (the "John Does").  The group of

John Does is defined as follows: United States person(s), who directly or indirectly had

authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX,

Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively,

"SFOX"), with at least the equivalent of $20,000 in value of transactions (regardless of

type) in cryptocurrency in any one year, for the period January 1, 2016 through

December 31, 2021 (the "John Doe Class").  The five document requests in the summons

are directed at two categories: user identity information and transaction activity.  Before

addressing why a summons for these requested items directed at this John Doe Class

meets the criteria in § 7609(f), this brief first provides relevant background regarding (I)

the definition of cryptocurrency, (II) its tax treatment, (III) the information regarding

taxable cryptocurrency transactions that is in the possession of SFOX, and (IV) the

grounds for the IRS's belief that these transactions are not being properly reported on

users' tax returns.

### A.     "Cryptocurrency" Defined

"Cryptocurrency" is one kind of "virtual currency."  IRS Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Mar. 26, 2014).  The IRS has defined "virtual currency" as "a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value."  *Id.*  It sometimes operates like "real" or "fiat" currency, *i.e.*, "the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance."  *Id.*  But virtual currency only has legal tender status in El Salvador.[1]  When virtual currency has an equivalent value in real currency, or acts as a substitute for real currency, then it is referred to as "convertible" virtual currency.  *See* IRS Notice 2014-21.

The summons at issue here solely concerns "cryptocurrency."  Cryptocurrency is a type of virtual currency that utilizes cryptography to secure transactions that are digitally recorded on a distributed ledger (such as a blockchain).  Declaration ¶¶ 16, 18.  Distributed ledger technology uses independent digital systems to record, share, and synchronize transactions, the details of which are recorded in multiple places at the same time with no central data store or administration functionality.  *See generally* U.S. Dep't of Justice, *Report of the Attorney General's Cyber Digital Task Force: Cryptocurrency*

---

[1] *See* Joe Hernandez, *El Salvador Just Became the First Country to Accept Bitcoin as Legal Tender*, NPR, (Sept. 7, 2021), https://www.npr.org/2021/09/07/1034838909/bitcoin-el-salvador-legal-tender-official-currency-cryptocurrency [https://perma.cc/962W-3P2N].

*Enforcement Framework* (Oct. 8, 2020),

https://www.justice.gov/ag/page/file/1326061/download [https://perma.cc/U5Z3-EJK4]

("Report of the Attorney General's Cyber Digital Task Force").  Units of cryptocurrency

are generally referred to as coins or tokens.  Declaration ¶ 16.  The most common

cryptocurrency is Bitcoin, but there are many others.[2]  The technological innovation,

rapid growth, and decentralized nature of cryptocurrency have created new challenges for

regulators, including the IRS.  *See generally Report of the Attorney General's Cyber*

*Digital Task Force.*

### B.    Tax Treatment of Cryptocurrency Transactions

Convertible virtual currencies (including cryptocurrency) are considered property

for tax purposes, and a taxpayer can have a taxable gain or loss on the sale or exchange of

a virtual currency.  *See* IRS Notice 2014-21.  Thus, taxpayers who transact in virtual

currencies may have related tax filing and reporting requirements under various

provisions of the Internal Revenue Code, including 26 U.S.C. §§ 1, 61, 451, 1011, 1211,

and 1222.

Taxpayers often complete their virtual currency transactions through businesses

known as digital currency exchanges, which allow users to buy and sell cryptocurrency in

exchange for fiat currency or other virtual currency.  Declaration ¶ 26.  Depending on the

---

[2] As of January 7, 2022, cryptocurrency tracking website www.coinmarketcap.com indicated that more than 16,520 separate cryptocurrencies existed. https://coinmarketcap.com/all/views/all/ [https://perma.cc/6TEC-2W8B].

details, these transactions may be taxable.  *See id*. ¶ 34.  Taxpayers must report income, gain, or loss from all taxable transactions involving virtual currency on their federal income tax returns for the year of the transaction, regardless of the amount or whether they received a payee statement or information return.  *See* IRS *Frequently Asked Questions on Virtual Currency Transactions*, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions [https://perma.cc/634V-UW5P] (Q 4, 42, 43).  Specifically, taxpayers must generally report on their tax returns gains or losses upon the disposition of virtual currency—i.e., the difference between their adjusted basis in the currency and the amount received in exchange for it.  *See* Declaration ¶¶ 34, 38 & n.4.  The IRS notified taxpayers in 2014 that virtual currency is treated as property for tax purposes, *see id*. ¶ 36 (citing IRS Notice 2014-21) and added questions specifically about virtual currency transactions to the individual tax forms beginning in 2019.  *See id.*

**C.    Information Regarding Cryptocurrency Transactions Held by SFOX**

OX Labs Inc., is the parent company for a U.S.-operating subsidiary that does business under the trade name SFOX.  Declaration ¶¶ 60-61.  SFOX is a cryptocurrency prime dealer and trading platform that connects exchanges, over-the-counter ("OTC") brokers, and liquidity providers globally.  *Id* ¶ 63.  SFOX has over 175,000 registered users and users have undertaken more than $12 billion in transactions since 2015.  *Id* ¶ 68.  As described by Forbes Magazine:

> Sfox aims to provide a single point of access for institutional
> investors, like crypto hedge funds and family offices, that move

large amounts of money.  Its platform plugs into digital currency exchanges and OTC desks . . . and tries to get the lowest price for buyers (and the highest price for sellers).  It does that by using a 'smart router' that scans the different trading venues for prices and tries to lock in the best deals . . . .  To make money, Sfox charges transaction fees, which range from 0.25% to 0.75%, depending on the type of order.  Over the past 12 months, it processed $5.4 billion in trades and brought in an estimated $15 million in revenue.

*Id*. (quoting Jeff Kauflin, *Startup Raises $23 Million to Make Crypto Trades Faster and Stealthier*, Forbes (Aug. 16, 2018),

https://www.forbes.com/sites/jeffkauflin/2018/08/16/startup-raises-23-million-to-make-crypto-trades-faster-and-stealthier/ [https://perma.cc/UNZ9-J8YB]).

SFOX is regulated as a "money services business" ("MSB"), and more specifically as a "money transmitter."  *See* 31 C.F.R. § 1010.100(ff) (defining "money services business"); § 1010.100(ff)(5) (defining "money transmitter" as one type of MSB); *see also* Declaration ¶ 71.  It is currently registered as an MSB with the Financial Crimes Enforcement Network (FinCEN).[3]  *Id.*

---

[3] FinCEN has issued guidance explaining that digital currency exchanges are generally to be regulated as money transmitters.  *See* FinCEN Guidance No. FIN-2013-G001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013), https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf [https://perma.cc/E9C8-YH3C]; FinCEN Guidance No. FIN-2019-G001, Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies (May 9, 2019), https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf [https://perma.cc/6BVK-AJVP].

An MSB like SFOX is required to maintain certain records.  *See* 31 C.F.R. §§ 1010.410 (Records to be made and retained by financial institutions) and 1022.400 (making these recordkeeping requirements applicable to MSBs).  Those records include, for transactions worth more than $3,000, the name and address of both the sender and recipient, the amount of the transaction, the date of the transaction, and other identifying information.  31 C.F.R. § 1010.410(e); Declaration ¶¶ 72-76.  MSBs are also required to obtain and maintain certain customer identification information and transactional data for the purpose of combating money laundering.  31 C.F.R. § 1022.210; Declaration ¶ 77.

In keeping with these rules, SFOX has historically required all new customers to create an account by submitting certain identifying information, including the user's name, email address, telephone number, and date of birth.  Declaration ¶¶ 83-84.  In addition, SFOX's Terms of Service explain that users "may be required to provide SFOX with certain personal information, including, but not limited to, your name, address, telephone number, e-mail address, date of birth, taxpayer identification number, government identification number, and information regarding your bank account (e.g., financial institution, account type, routing number, and account number)."  *Id.* ¶ 85.

Based on the regulations applicable to SFOX, as well as SFOX's historical business practices, the IRS expects that in response to the John Doe summons, SFOX will be able to provide information about the identities and cryptocurrency transactions of SFOX users, which the IRS will then be able to use in conjunction with other publicly

available information to examine whether these users have complied with the internal revenue laws.  Declaration ¶¶ 33, 83-88.

**D.     Grounds for the IRS's Belief that Virtual Currency Transactions Are Not Being Properly Reported**

In recent years, the IRS has become aware of significant tax compliance issues relating to the use of virtual currencies. *Id.* ¶ 4.  Of particular relevance, the IRS has reason to believe that virtual currency transactions are not being properly reported based on Agent Lee's knowledge about likely tax non-compliance by specific SFOX users; the lack of third-party reporting in connection with such transactions; and the IRS's experience with the John Doe summons that was served on Coinbase, Inc., a U.S.-based digital currency exchange; and internal IRS data.

**1.     Suspected Tax Non-Compliance by SFOX Users**

As explained in detail in the Declaration, Agent Lee has conducted an investigation and identified specific individuals who held accounts with SFOX and may have failed to comply with their tax reporting requirements under the internal revenue laws. Declaration ¶ 59.  Ten specific taxpayers— referred to as "Taxpayer 1" through "Taxpayer 10"—are discussed in the Declaration.

From 2016 through 2018, Taxpayer 1, personally and through a wholly owned limited liability company ("LLC 1"), was allegedly involved in a Ponzi scheme. *Id.* ¶ 93. As part of the alleged scheme, bank accounts held in the name of Taxpayer 1 and LLC 1 were used to receive and transfer funds.  Taxpayer 1 and LLC 1 received approximately $1 million from various third party-merchants, digital currency exchanges, and SFOX.

*Id*.  Taxpayer 1 reported income on a 2016 tax return stemming primarily from IRS Form W-2 wages and reported income on 2017 and 2018 tax returns stemming primarily from Form W-2 wages and from LLC 1, which was reported on Schedule C (Profit or Loss from Business).  *Id*.  Although Taxpayer 1 reported approximate Schedule C gross receipts of $0, $650,000, and $125,000 in 2016, 2017, and 2018, respectively, those reported amounts are significantly less than the approximately $1 million of known deposits during the same period.  *Id*.  Furthermore, Taxpayer 1 did not report any gain or loss from virtual currency transactions on a Schedule C or any other schedule or form on the 2016, 2017, or 2018 tax returns.  *Id*.  Because the sale or exchange of cryptocurrency and the receipt of cryptocurrency as compensation are taxable events, Taxpayer 1's receipt of U.S. dollars from digital currency exchanges and SFOX should have been reported.

Taxpayer 2 is a YouTube video creator and online gambler who received cryptocurrency deposits from YouTube subscribers and gambling.  *Id.* ¶ 94.  In 2018 and 2019, Taxpayer 2 made cryptocurrency deposits of approximately $120,000 into an SFOX account.  *Id*.  The deposited cryptocurrency was immediately exchanged into U.S. dollars and transferred from the SFOX account to a bank account.  *Id*.  Taxpayer 2 answered "Yes" to the 2019 Schedule 1 question, "At any time during 2019, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency during the year?"  *Id*.  Even though the receipt of cryptocurrency as compensation and the exchange of cryptocurrency into U.S. dollars are taxable events,

Taxpayer 2 failed to report any gain or loss from cryptocurrency transactions, including the sales conducted through SFOX, on a Schedule D (Capital Gains or Losses) or any other schedule or form on the 2018 and 2019 tax returns.  *Id.*

In 2018, Taxpayer 3 deposited approximately 20 units of Bitcoin into several SFOX accounts.  At the time of the deposits, the Bitcoin was worth approximately $120,000.  *Id.* ¶ 95.  On the same day the Bitcoin was deposited, it was exchanged for U.S. dollars and transferred from SFOX to Taxpayer 3's personal bank account.  In total, Taxpayer 3 transferred approximately $115,000 from SFOX to the personal bank account.  *Id.*  The income reported on Taxpayer 3's 2018 tax return stems from Schedule C income, and the amount reported on the Schedule C is significantly less than the amounts from those transactions.  *Id.*  In addition, Taxpayer 3 failed to report any gain or loss from cryptocurrency transactions, including the sales conducted with SFOX, on a Schedule D or any other schedule or form on the 2018 tax returns.  *Id.*

In 2018 and 2019, Taxpayer 4 deposited approximately 15 total units of Bitcoin into an SFOX account.  *Id.* ¶ 96.  At the time of the deposits, the Bitcoin was worth approximately $60,000.  *Id.*  On the same days the Bitcoin were deposited with SFOX, Taxpayer 4 exchanged the Bitcoin into U.S. dollars and transferred the proceeds into a personal bank account.  *Id.*  In total, Taxpayer 4 transferred approximately $55,000 from SFOX to the bank account.  Taxpayer 4 did not file a tax return for 2018.  Taxpayer 4 did file a 2019 tax return that reported only one dollar of taxable interest income but did not report any gain or loss from virtual currency transactions on any schedule or form.  *Id.*

Between October 2018 and March 2019, Taxpayer 5 received Automated Clearing House ("ACH") (*i.e.*, electronic) and cash deposits of approximately $55,000 into a personal bank account from various third parties. *Id.* ¶ 97. Approximately $7,000 of such deposits were received from SFOX. *Id.* Taxpayer 5 subsequently withdrew approximately $30,000 of the deposits in 47 separate cash withdrawals. *Id.* Taxpayer 5's 2018 and 2019 tax returns reported income stemming primarily from wages reported on Forms W-2. Taxpayer 5's 2018 and 2019 tax returns did not report any gain or loss from the transactions described above or any other income from virtual currency transactions on any schedule or form. *Id.*

In 2017 and 2018, Taxpayer 6 received ACH deposits into a personal bank account of approximately $30,000 from various third parties, including SFOX and a digital currency exchange. *Id.* ¶ *98.* During the same period, Taxpayer 6 deposited approximately $20,000 in cash and checks from unknown sources into the same bank account. *Id.* Taxpayer 6 subsequently withdrew approximately $45,000 of the deposited funds, primarily in cash or through point-of-sale transactions. *Id.* Taxpayer 6's 2017 and 2018 tax returns only reported income stemming from wages reported on Forms W-2. *Id.*

Taxpayer 7 made cryptocurrency deposits into two SFOX accounts of approximately $20,000 and $60,000 in 2018 and 2019, respectively. *Id.* ¶ 99. The deposited cryptocurrency was exchanged into U.S. dollars and subsequently transferred out of the SFOX accounts to a bank account. *Id.* Yet, on a 2018 tax return Taxpayer 7 only reported income stemming from Form W-2 wages and interest and failed to report

any gain or loss from the sales of cryptocurrency, including the sales conducted through SFOX. *Id.* On the 2019 tax return, Taxpayer 7 reported Bitcoin sales of approximately $10,000 on Schedule D and Form 8949 (Sales and Other Dispositions of Capital Assets). *Id.* However, this reported amount is far less than the approximately $60,000 of known sales conducted through SFOX in 2019. *Id.*

Taxpayer 8 deposited approximately $5,000 of cryptocurrency into an SFOX account in November 2018. *Id.* ¶ 100. On the same day the cryptocurrency was deposited, it was exchanged for U.S. dollars and the proceeds transferred from SFOX to Taxpayer 8's personal bank account. *Id.* However, Taxpayer 8's 2018 tax return only reported income stemming from Form W-2 wages and did not report any gain or loss from virtual currency transactions on any schedule or form including the sales conducted through SFOX. *Id.*

Taxpayer 9 deposited approximately 2 units of Bitcoin into an SFOX account in June 2018. *Id.* ¶ 101. At the time of the deposits, the Bitcoin was worth approximately $10,000. *Id.* On the same day it was deposited the Bitcoin was exchanged for U.S. dollars and the proceeds transferred from SFOX to Taxpayer 9's personal bank account. *Id.* Taxpayer 9's 2018 tax return only reported income stemming from Form W-2 wages, Individual Retirement Accounts ("IRAs")/pensions/annuities, and unemployment income. Taxpayer 9 failed to report any gain or loss from the sale of cryptocurrency, including the sales conducted with SFOX, on the 2018 tax return.

Between October 2018 and January 2019, Taxpayer 10's personal bank account

was funded with approximately $5,000 in ACH deposits from several digital currency exchanges, including approximately $4,000 received from SFOX that appear to be proceeds from the exchange of cryptocurrency. *Id.* ¶ 102. During the same period, Taxpayer 10 made an additional 42 cash deposits totaling approximately $10,000. *Id.* The same bank account also had 62 transfers, totaling approximately $5,000, to a digital currency exchange and approximately $5,000 of internet and point of sale/debit card purchases. *Id.* Taxpayer 10's 2018 and 2019 tax returns only reported income stemming from Form W-2 wages, IRAs/pensions/annuities, and social security benefits. Those returns did not report any income from the above referenced transactions or any gains or losses from virtual currency transactions on any schedule or form.

Based on these examples, the IRS suspects that there may be many more SFOX users who have failed to report their cryptocurrency transactions, and to pay their associated tax liabilities, in accordance with the internal revenue laws.

### 2.      The Lack of Third-Party Reporting to the IRS

SFOX does not make any third-party reports to the IRS of cryptocurrency transactions that occur on its platforms. *Id.* ¶ 45; *see also id.* ¶ 118 (stating that the IRS does not already possess the information requested by the summons). This information gap is a concern for the IRS because, as Agent Lee's Declaration explains, cryptocurrency transactions can already be difficult to trace, with many having an inherently pseudo-anonymous aspect, making them especially attractive to taxpayers who may want to use them to hide taxable income. *Id*. ¶ 44.

More generally, the IRS's experience is that tax noncompliance increases when there is less third-party information reporting, making the likelihood of underreporting significant.  *Id.* ¶ 45; *see* Barry W. Johnson & Peter J. Rose, IRS Publication 1415, *Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011–2013*, at 13 (Sept. 2019), https://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/2XM5-PDNH] (finding that the net misreporting percentage "for income amounts subject to little or no information reporting . . . is 55 percent."); *see also Patricia Cohen, If the I.R.S. Is Watching You, You'll Pay Up*, N.Y. Times, Jan. 5, 2016, at B1, https://www.nytimes.com/2016/01/05/business/economy/if-the-irs-is-watching-you-youll-pay-up.html [https://perma.cc/S9DK-QYU6].  Unfortunately, the problem of a lack of third-party reporting of cryptocurrency transactions is not limited to SFOX.  *See* Wendy Walker, *INSIGHT: The 5 Most Common Tax Reportable Crypto Events,* Bloomberg Tax (Aug. 20, 2020), https://news.bloombergtax.com/daily-tax-report/insight-the-5-most-common-tax-reportable-crypto-events [https://perma.cc/TH2J-5TT6] (noting that "a recent survey of crypto CPAs found that more than 35% of crypto investors do not receive Form 1099 information related to their crypto transactions").  As the Treasury Inspector General for Tax Administration ("TIGTA") has reported, "[t]he IRS cannot easily identify taxpayers with virtual currency transactions because of the lack of third-party information reporting that specifically identifies virtual currency transactions." TIGTA Ref. No. 2020-30-066, *The Internal Revenue Service Can Improve Taxpayer Compliance for Virtual Currency Transactions*, (Sept. 24, 2020),

https://www.treasury.gov/tigta/auditreports/2020reports/202030066fr.pdf

[https://perma.cc/83SZ-YJUK].

### 3.    The John Doe Summons to Coinbase, Inc., and Its Aftermath

In November 2016, the U.S. District Court for the Northern District of California authorized service of a John Doe summons on Coinbase, Inc. ("Coinbase"), a U.S.-based cryptocurrency exchange, for information to be used in identifying taxpayers who conducted transactions in virtual currency.  *See United States v. John Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal. Nov. 30, 2016).  Coinbase was served with the summons but did not voluntarily comply with it.  Declaration ¶ 10.  The government then petitioned to enforce the summons, and after the IRS agreed to narrow the scope of the summons, the court granted in part and denied in part the enforcement petition.  *See United States v. Coinbase, Inc*., No.17-cv-01431-JSC, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017).  Coinbase was ordered to produce documents for accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one year for the period between 2013 and 2015.  *Id*. at *8.

Since Coinbase ultimately complied with the John Doe summons, the IRS has continued to reach out to taxpayers engaged in cryptocurrency transactions, regarding their reporting requirements, to conduct examinations, and to make referrals to its Criminal Investigation Division.  Declaration ¶ 48.  On July 26, 2019, the IRS announced that it had begun sending letters to owners of virtual currency, advising them to pay back taxes and file amended returns.  Declaration ¶ 14.  By the end of August 2019, the IRS

had sent more than 10,000 such letters to taxpayers who owned virtual currency. *Id*. Following the issuance of such letters, many taxpayers filed amended returns reporting virtual currency transactions for tax years 2013 through 2019 that were not previously reported. *Id*. ¶ 49. To date, these IRS letters have resulted in more than $17.6 million in assessments. *Id*.

The IRS has also opened audits of taxpayers identified by materials it received in response to the Coinbase John Doe summons, and it has received submissions through its voluntary disclosure practice as well. *Id*. ¶¶ 48-50. Separately, the IRS has contacted taxpayers who have not filed returns reporting virtual currency by sending them notices related to virtual currency. Those notices have already resulted in more than $92 million in assessments. *Id*. ¶ 49. The IRS expects these numbers to increase as the investigations continue. More recently, the IRS has sent letters to taxpayers who conducted transactions with foreign virtual currency exchanges and may have failed to properly report such transactions and associated income. *Id*. ¶ 50.

During the summons enforcement litigation against Coinbase, the IRS determined, based on searches of internal data that for the years 2013-2015, only 800 to 900 taxpayers per year filed tax returns with a property description related to Bitcoin or virtual currency, even though Coinbase alone had serviced more than 5.9 million customers and handled more than $6 billion in transactions during that time. This was strong evidence of likely large-scale underreporting of taxable transactions. *See Coinbase*, 2017 WL 5890052, at *1-2, 4-5; Declaration ¶ 46. The number of taxpayers filing returns with a

property description related to Bitcoin or virtual currency increased in 2016-2019, but still fall far short of what would be expected given the number of users, transactions, and value that the exchanges publicize occur on an annual basis. *See* Declaration ¶ 47.

## III. LAW AND ARGUMENT

### A.    Governing Law

The IRS is statutorily required to have its employees "proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax." 26 U.S.C. § 7601(a). To this end, the IRS has broad investigative powers "[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability." *Id.* § 7602(a). To fulfill these purposes, the IRS "is authorized" by statute:

> (1)    To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
>
> (2)    To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and
>
> (3)    To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

*Id.*  Congress intended "to provide the [IRS] with broad latitude to adopt enforcement techniques helpful in the performance of [its] tax collection and assessment responsibilities."  *United States v. Euge*, 444 U.S. 707, 716 n.9 (1980); *see also United States v. Jose*, 131 F.3d 1325, 1329 (9th Cir. 1997); *United States v. Bell*, 57 F. Supp. 2d 898, 906 (N.D. Cal. 1999) ("The IRS has broad investigatory powers that are set forth in §§ 7601 through 7610 of the Internal Revenue Code.").  Indeed, the Supreme Court has noted that the IRS's summons power forms the "centerpiece" of the agency's "expansive information-gathering authority."  *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984).

When issuing an administrative summons to a third party regarding a taxpayer, the IRS is generally required to give notice to the taxpayer.  26 U.S.C. § 7609(a)(1).  The taxpayer then has the right to file a petition in court seeking to quash the summons.  *Id.* § 7609(b)(2)(A).  However, the third-party notice rules do not apply to certain types of summonses, including a so-called "John Doe" summons, *see id.* § 7609(c)(3), defined as a summons that "does not identify the person with respect to whose liability the summons is issued," *id.* § 7609(f).  Instead, a John Doe summons "may be served only after a court proceeding" establishing the elements listed in § 7609(f).  *Id.*  This proceeding is necessarily ex parte because the point of a John Doe summons is to allow the IRS to obtain information when the identity of the taxpayer is unknown.  *See id.* § 7609(h)(2) (stating that the court's determination under § 7609(f) "shall be made ex parte and shall be made solely on the petition and supporting affidavits").

The reviewing court, in such an ex parte proceeding, effectively serves the same function as a taxpayer in a § 7609(b)(2)(A) petition to quash. *See Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 317 (1985) ("As a substitute for the procedures of §§ 7609(a) and (b), Congress enacted § 7609(f)[.]"); *United States v. Gertner*, 65 F.3d 963, 965 n.1 (1st Cir. 1995) ("[T]he court in effect 'takes the place of the affected taxpayer' who, being unnamed, cannot herself be expected to know about—let alone to oppose— the summons even if it is irregular." (quoting *Tiffany Fine Arts*, 469 U.S. at 321)). "Congress did not intend to impose stringent restrictions on the [IRS's] investigatory function but merely sought to prevent the indiscriminate exercise of the John Doe summons power." *United States v. Ernst & Whinney*, 750 F.2d 516, 519-20 (6th Cir. 1984) (internal quotation marks and emphasis omitted).

Section 7609(f) provides that the IRS may not serve a John Doe summons until after a court proceeding in which the government establishes the following three numbered elements:

(1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,

(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

(3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

26 U.S.C. § 7609(f).  Additionally, as of 2019, the statute requires that the summons be "narrowly tailored to information that pertains to the failure (or potential failure) of the

19

person or group or class of persons referred to in paragraph (2) to comply with one or more provisions of the internal revenue law which have been identified for purposes of such paragraph." *Id.*

## B. Application of § 7609(f)

The summons at issue here meets all three of the numbered criteria in § 7609(f) as well as the "narrowly tailored" requirement.[4]

### 1. The Summons Relates to the Investigation of an Ascertainable Class

The first of the three numbered requirements in § 7609(f) is that "the summons relates to the investigation of a particular person or ascertainable group or class of persons." *Id.* § 7609(f)(1). This first prong is met here because the John Doe Class is particularized from the general public and SFOX has the information necessary to ascertain whether its customers are members of the class.

---

[4] Recently, the IRS sought leave to serve two John Doe summonses for cryptocurrency-related information like the information sought here and based upon similar evidence. In both cases, the relevant district courts found the IRS had successfully demonstrated the three statutory criteria of § 7609(f) and satisfied the narrowly tailored requirement. The first such John Doe summons was issued on April 9, 2021, to Circle Internet Financial, Inc., which offers digital currency exchange services. *See* Order, *In the Matter of the Tax Liabilities of John Does*, No. 21mc91201-RGS, 2021 WL 2291031 at *1 (D. Mass. Apr. 1, 2021) ("Circle"). The second was issued to Payward Ventures Inc. d/b/a Kraken, a digital currency exchange, on May 11, 2021. *See* Order Granting Narrowed Petition, *In re Tax Liability of John Does*, No. 21-cv-02201-JCS, 2021 WL 2314968 at *1 (N.D. Cal. May 5, 2021) ("Kraken"). The United States and both summoned parties are in the process of negotiating compliance with those summonses. Declaration ¶ 15.

As noted above, the summons defines the John Doe Class as follows: "United States person(s), who directly or indirectly had authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX, Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, 'SFOX'), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2020."  This class is ascertainable because it is limited in at least four ways.  First, it is limited to SFOX account holders. Second, it is limited to United States persons.[5]  Third, it is limited to those account holders whose transactions were worth at least $20,000 in a year.  Fourth, it is limited to the six-year period of 2016-2021.  These class definition limitations are nearly identical to the limitations that were used in two other recent John Doe summons cases where the IRS sought permission to serve summonses for cryptocurrency-related information from Circle and Kraken.  In both of those cases, the reviewing district courts found the class

---

[5] "As defined in the Internal Revenue Code:

The term 'United States person' means—
(A) a citizen or resident of the United States,
(B) a domestic partnership,
(C) a domestic corporation,
(D) any estate (other than a foreign estate, within the meaning of paragraph (31)), and
(E) any trust if—
    (i) a court within the United States is able to exercise primary supervision over the administration of the trust, and
    (ii) one or more United States persons have the authority to control all substantial decisions of the trust."
26 U.S.C. § 7701(a)(30).

definition to be statutorily sufficient. *Does*, 2021 WL 2291031 at *1; *Does*, 2021 WL

2314968 at *1. Prior to those summonses, the IRS issued a John Doe summons to

Coinbase after the district court granted it leave to serve. That district court also found

the proposed John Doe class ascertainable based on a class definition with similar

limitations. *United States v. John Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal.

Nov. 30, 2016).

Moreover, the John Doe Class identified in the summons is "ascertainable"

because courts have repeatedly found § 7609(f)(1) to be satisfied where a summons

identifies a particular group of taxpayers in a similar manner. For example, this

requirement has also been satisfied where a summons "squarely particularize[d] the

individuals sought from the general public" by identifying the class as California

residents who, between 2005 and 2010, were involved in certain property transfers for

little or no consideration. *See In re Tax Liab. of Does*, No. 2:10-mc-00130-MCE-EFB,

2011 WL 6302284, at *2 (E.D. Cal. Dec. 15, 2011). Likewise, the IRS satisfied the

"ascertainable group" standard where a summons concerned U.S. taxpayers who, as

agents for subsidiaries of a certain company, sold credit insurance policies reinsured with

entities in the Turks and Caicos Islands. *See In re Tax Liab. of Does*, No. 03-22793-CIV,

2003 WL 22953182, at *1 (S.D. Fla. Oct. 30, 2003) ("*American Bankers Insurance

Group*"); *see also Matter of Does*, Case No. CV-13-3393 YGR, 2013 WL 5503135

(N.D. Cal. Aug. 29, 2013) (approving John Doe class of U.S. taxpayers who had accounts

with CIBC First Caribbean International Bank Limited through correspondent account at

Wells Fargo Bank, N.A., during 2004-2012); *In Matter of Tax Liabilities of Does*, Civ.

No. 3:96-CV-25(DF), 1996 WL 196633, at *1 (M.D. Ga. Feb. 5, 1996) ("As required by

26 U.S.C. § 7609(f)(1), the summons relates to the investigation of an ascertainable

group or class of persons, that is, individuals, businesses, corporations, partnerships, joint

ventures, and companies within the State of Georgia that received payments from The

Loef Company, for the sale of recyclable materials, (also referred to as scrap metal),

including commissions, for the calendar years 1992, 1993 and 1994.").

Moreover, as discussed in Part II.C above, SFOX should be able to ascertain from

its records which of its users were U.S persons, and who among them engaged in

transactions equaling or exceeding $20,000 during the years specified in the summons,

based on the information that the IRS expects it collects from its customers.  The

availability of this information to SFOX means that the John Doe Class is an

"ascertainable group of class of persons" and that § 7609(f)(1) is satisfied.

> **2.** **There Is a Reasonable Basis for Believing that the John Doe Class May Fail, or May Have Failed, to Comply with the Internal Revenue Laws**

The second element that the government must establish is that "there is a

reasonable basis for believing that such person or group or class of persons may fail or

may have failed to comply with any provision of any internal revenue law."  26 U.S.C.

§ 7609(f)(2).  Taxpayers must report income, gain, or loss from all taxable transactions

involving cryptocurrency on their federal income tax returns for the year of the

transactions.  *See* 26 U.S.C. §§ 1, 61, 451, 1011, 1211, and 1222.  Here, there is a

reasonable basis for believing that members of the John Doe Class may fail (or may have already failed) to report, or to pay tax associated with, cryptocurrency transactions. This belief is based upon the information discussed in Part II.D above: Agent Lee's personal knowledge of non-compliance by SFOX users; the lack of third-party reporting to the IRS by SFOX regarding its customers' transactions; the IRS's experience with the Coinbase John Doe summons and its aftermath; and the search results showing likely large-scale underreporting of taxable cryptocurrency transactions.

To meet the "reasonable basis" prong of § 7609(f)(2), the government need only show that a transaction has occurred that is "of such a nature as to be reasonabl[y] suggestive of the possibility that the correct tax liability with respect to that transaction may not have been reported." H.R. Rep. No. 94-658 at 311 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3208; *see, e.g.*, *United States v. Ritchie*, 15 F.3d 592, 601 (6th Cir. 1994) (clients' payment for legal services with large amounts of cash provided reasonable basis for John Doe summons). When enacting § 7609(f), Congress did "not intend to impose an undue burden on the [IRS] in connection with obtaining a court authorization to serve this type of summons." H.R. Rep. No. 94-658 at 311, *reprinted in* 1976 U.S.C.C.A.N. at 3207. Rather, it sought to ensure that the IRS would have "a specific situation to present in the court," instead of using the summonses to engage in a "possible 'fishing expedition.'" *Id.*; *see also In re Tax Liabs. of Does*, 688 F.2d 144, 149 (2d Cir. 1982) (Section 7609(f) was "concerned only with . . . preclud[ing] the IRS from using [John Doe] summonses to engage in possible 'fishing expeditions.'" (quoting H.R. Rep.

No. 94-658 at 311)).  The government need not "produce conclusive evidence of an actual tax violation as a prerequisite to obtaining a John Doe summons."  *In re Does*, 671 F.2d 977, 980 (6th Cir. 1982) (per curiam) ("*Columbus Trade Exchange"*).  The point of the statute is merely "to prevent the [IRS] from exercising its summons power in an arbitrary or quixotic manner."  *Id*.

In the recent Circle and Kraken John Doe summons cases, the reviewing district courts found that there was a reasonable basis for believing that those similarly defined classes had failed or may have failed to comply with internal revenue laws based upon similar evidence to that presented here.  *Does*, 2021 WL 2291031 at *1; *Does*, 2021 WL 2314968 at *1.

Moreover, prior experience with similar transactions involving similar parties is a reasonable basis under § 7609(f)(2).  For example, in the early 1980s, the IRS sought approval to serve several John Doe summonses on so-called barter exchanges.  *See, e.g.*, *Columbus Trade Exchange*, 671 F.2d 977.  Those barter exchanges are analogous to virtual currency exchanges insofar as the IRS's experience showed that their customers, whose identities were unknown, were likely to be underreporting the tax on their transactions.  *See, e.g.*, *id.* at 980.  In affirming the district court's order approving the issuance of the summons, the Sixth Circuit held that the IRS's "past experience with this problem is a 'reasonable basis' for its decision to investigate the returns of Columbus Exchange members."  *Id.*

Other courts made similar rulings. *See United States v. Pittsburgh Trade Exchange, Inc*., 644 F.2d 302, 306 (3d Cir. 1981) (finding, based on IRS agent's testimony, that "barter transactions such as those arranged by The Exchange are inherently susceptible to tax error since no cash is involved and the only records of the members' credits are kept by The Exchange, which allegedly does not provide members any information regarding their trade accounts. Such circumstances provide a sufficient basis for the Internal Revenue Service's action."); *United States v. Island Trade Exchange, Inc*., 535 F. Supp. 993, 996-97 (E.D.N.Y. 1982) (approving John Doe summons to barter exchange and finding "reasonable basis" requirement in § 7609(f)(2) met based on IRS agent's declaration that "prior examinations of bartering exchanges and their members by the Internal Revenue Service revealed high levels of omitted or improperly reported income," as well as features of bartering transactions that made them susceptible to improper tax reporting). Equally here, the IRS's knowledge of non-compliance by some SFOX users, the Coinbase John Doe summons, the recent Circle and Kraken John Doe summonses, and other situations in which there is a lack of third-party reporting all strongly suggest that there is a reasonable basis for the summons in this case.

As in the barter-exchange cases, in all the John Doe summons cases arising from the IRS's Offshore Credit Card Project, courts have found a "reasonable basis" for suspecting non-compliance by offshore credit card users based on the IRS's general experience with undisclosed foreign accounts—even in the absence of audits involving the summoned parties—because individuals using credit cards to repatriate funds from

offshore bank accounts are likely to be engaged in tax evasion. *See, e.g.*, *In re John Does*, No. 1:00-CV-3919, 2000 WL 34538137 (S.D. Fla. Oct. 30, 2000) (*American Express & MasterCard International, Inc*.); *In re John Does*, No. CV-02-0049-MISC-PJH (N.D. Cal. 2002) (*VISA International*); *In re John Does*, No. 02-22404 CIV-UNGARO-BENAGES 2002 WL 32879613, at *1 (S.D. Fla. Aug. 20, 2002) (*MasterCard International, Inc*.); *In re John Does*, No. 03-22177 CIV-Martinez (S.D. Fla. 2003) (*Credomatic of Florida Inc*.); *In re John Does*, No. 04-F-1548 (OES) (D. Colo. 2004) (*First Data Corporation*); *In re John Does*, No. 04-21986-CIV-UNGARO-BENAGES (S.D. Fla. 2004) (*TecniCard, Inc*.); and *In re John Does*, No. 4:04-cv-94-1 (CDL) (M.D. Ga. 2004) (*Total Systems Services, Inc*.).

Here, the evidence the IRS has developed to date is reasonably suggestive of the possibility that the correct tax liabilities with respect to cryptocurrency transactions conducted through SFOX's platforms may not have been properly reported. Declaration ¶ 59. Agent Lee is personally aware of several instances of previously unreported (and likely taxable) transactions involving SFOX users. *Id*. ¶¶ 93-102. Moreover, the IRS knows that when third-party reporting is lacking, the incidence of tax non-compliance increases greatly. And SFOX, like other prime dealers and virtual currency exchanges, does not issue Forms 1099 or otherwise engage in third-party transactional reporting to the IRS. Additionally, as in the barter-exchange cases, the IRS's experience with cryptocurrency, especially with respect to the Coinbase John Doe summons, indicates a likelihood of non-compliance by SFOX customers. This suspicion is bolstered by the

internal IRS data search results.

Given all this evidence, the IRS has far more than a mere suspicion that the John Doe Class includes taxpayers who are not complying with the law.  Rather, the evidence strongly suggests that there has been, and continues to be, failure by certain SFOX users to comply with the internal revenue laws in reporting the taxable consequences from cryptocurrency transactions.  The "reasonable basis" prong of § 7609(f)(2) is therefore satisfied.

### 3. The Information Sought in the Summons Is Not Readily Available from Other Sources

The third numbered requirement of § 7609(f) is that "the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources."  This prong is met because the information sought in the summons to SFOX is not readily available to the IRS from other sources.  As noted above, there is no third-party reporting by SFOX to the IRS regarding the cryptocurrency transactions that are conducted on its exchanges.  Declaration ¶ 45.  The IRS also has reason to believe that a significant portion of such transactions are not being properly reported by the taxpayers themselves either, but the IRS is presently unable to audit such taxpayers because their identities are unknown.  Further, while the IRS is also filing a petition in the U.S. District Court for the Southern District of New York seeking leave to serve a John Doe summons on M.Y. Safra Bank, FSB ("M.Y. Safra") itself, the IRS believes—based on information in its possession and because of the account services M.Y. Safra offers its

users—that SFOX and M.Y. Safra may possess related, but qualitatively different, user and transaction information.  Accordingly, the John Doe summonses for SFOX and M.Y. Safra make distinct requests that reflect the information each entity is believed to separately possess.  Declaration, ¶ 116; *see Am. Bankers Ins. Group*, 2003 WL 22953182, at *1 (finding § 7609(f)(3) met because "information sought by the IRS to continue their investigation is not readily available through a means other than from [the summoned party] itself").

Where, as here, the IRS is unable to identify the members of the John Doe Class, and one of the principal purposes of the summons is to discover the class members' identities, courts have repeatedly found the § 7609(f)(3) prong of the test to be satisfied. As was the case with the most recent John Does summonses for cryptocurrency-related information directed to Circle and Kraken, and before that Coinbase.  *Does*, 2021 WL 2291031 at *1; *Does*, 2021 WL 2314968 at *1; *United States v. John Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal. Nov. 30, 2016).  Other examples include where courts have approved summonses where the identities of the persons to be investigated are not readily available but are known to foreign institutions.  *See In re Tax Liabs. of Does*, No. 11-cv-01686-PJH, Dkt. No. 10 (N.D. Cal. Apr. 7, 2011) (authorizing John Doe summons to HSBC Bank USA, N.A. seeking financial account records establishing the identities of U.S. taxpayers with interests in HSBC's Indian bank accounts); *MasterCard International, Inc*., 2002 WL 32879613, at *1 (authorizing service of a John Doe summons seeking the identity of U.S. taxpayers who held certain credit card accounts

with ties to foreign banks); *American Express & MasterCard International, Inc.*, 2000 WL 34538137, at *1 (identities of taxpayers not readily available except from American Express and MasterCard International, Inc., who possessed credit card information for cards issued by offshore banks).

Even if it were theoretically possible for the IRS to obtain some of the information sought in the summons from a labor-intensive review of its own files, that would not prevent § 7609(f)(3) from being satisfied.[6]  Courts take a "practical" approach when information "cannot without unreasonable burden, expense and unwarranted delay be retrieved from the files of the Courts take a "practical" approach when information "cannot without unreasonable burden, expense and unwarranted delay be retrieved from the files of the [IRS]."  *United States v. Reprints, Inc.*, 43 A.F.T.R.2d 79-463, 1978 WL 1238, at *1 (N.D. Ga. Nov. 18, 1978); *see also United States v. John G. Mutschler & Assocs., Inc.*, 734 F.2d 363, 367-68 (8th Cir. 1984) (in summons enforcement proceeding, taking "practical approach to IRS accessibility" in declining to order "manual search of 18,000 opinion letter applications" to identify those prepared by summoned party, calling that "an unreasonable and imprecise method" of locating information); *United States v. Berkowitz*, 488 F.2d 1235, 1236 (3d Cir. 1973) (per curiam) (noting, in summons enforcement proceeding, that "[t]o require the [IRS] to review individually the millions

---

[6] *Cf. Sugarloaf Funding, LLC v. U.S. Dept. of Treas.*, 584 F.3d 340, 350 (1st Cir. 2009) (holding, in summons enforcement proceeding, that "the IRS is entitled to obtain relevant records from third parties to compare for accuracy any records obtained from the taxpayer").

of forms filed in 1971" to locate those sought by summons "is so obviously burdensome as to make the procedure prohibitive" and concluding "from a practical standpoint those returns would not be readily available to the government").

The only entities possessing information relating to virtual currency transactions that identify the persons involved in the transactions, and that hold material relating to the transactions, are the exchangers, service providers, and any intermediaries.  Therefore, it is logical to summon SFOX for this identifying and transactional information regarding SFOX's users, which is not readily available from any other source.

### 4. The Summons Is Narrowly Tailored to Information that Pertains to the Failure (or Potential Failure) of the Class to Comply with the Internal Revenue Laws

An additional requirement Congress added to § 7609(f) in 2019 is that a John Doe summons must be "narrowly tailored to information that pertains to the failure (or potential failure) of the person or group or class of persons referred to in paragraph (2) to comply with one or more provisions of the internal revenue law which have been identified for purposes of such paragraph."  This narrow-tailoring requirement is met because the summons' requests are specifically directed at information that will shed light on the potential non-compliance that the IRS is concerned about—non-reporting of cryptocurrency transactions and non-payment of associated tax—as well as the identities of those taxpayers who may not be complying with tax laws.  As mentioned above, this includes potential non-compliance with several provisions of the Internal Revenue Code, such as 26 U.S.C. §§ 1, 61, 451, 1011, 1211, and 1222.

Congress added the new language as part of the Taxpayer First Act, Pub. L. No. 116-25, § 1204(a), 133 Stat. 981, 988 (2019), and it applies to summonses served on or after August 16, 2019.  Congress's intent was to ensure that "the information sought in the summons [is] at least potentially relevant to the tax liability of an ascertainable group," and that the summons is not used "for the purposes of a fishing expedition." H.R. Rep No. 116-39, at 41 (2019).  The added text "is not intended to change the *Powell* standard"—*i.e.*, the showing the IRS must make in support of summons enforcement— "or otherwise affect the IRS's burden of proof."  *Id.* at 42 (citing *United States v. Powell*, 379 U.S. 48 (1964)); *accord* Joint Committee on Taxation, *Description of H.R. 1957, the "Taxpayer First Act of 2019,"* at 15 (2019), https://www.jct.gov/CMSPages/GetFile.aspx?guid=673878f4-0d0f-4304-a14c-c9740276676a [https://perma.cc/49QV-GWV6].

This statutory requirement is satisfied here.  Agent Lee's Declaration explains in detail the direct connection between each of the five items requested in the summons attachment and the IRS's investigation concerning non-compliance with the internal revenue laws.  *See* Declaration ¶¶ 118-166.  Those five document requests fit within two categories.  *Id.* ¶ 121.  The first category of requests is directed at adequately identifying the John Doe class members so that transactional data can reasonably be associated with a particular person.  *Id.* ¶ 122.  For example, Request No.1 on the summons attachment, seeking account registration records, will assist the IRS in this process.  *See id.* ¶¶ 125-150.  The second category of requests is directed at obtaining transactional information

that may permit the IRS to evaluate whether a particular taxpayer complied fully with internal revenue laws.  *Id*. ¶ 123.  For example, Request No. 3 on the summons attachment seeks all records of account activity, including records that reflect the particulars of a transaction such as the date, the amount, the transaction type, the account post-transaction balance, and requests or instructions to send or receive virtual currency. These records should contain the information necessary to determine the correct federal tax liability of applicable SFOX users.  *Id*. ¶¶ 155-165.  Moreover, the user identity information and the corresponding transactional information the IRS seeks from SFOX is like what was sought in the John Doe summonses recently issued to Circle and Kraken. Both of those reviewing district courts found that the John Doe summons' requests for user identity and transaction information were narrowly tailored to information that pertained to the failure (or potential failure) of the class.  *Does*, 2021 WL 2291031 at *1; *Does*, 2021 WL 2314968 at *1.

As these and other more detailed explanations in Agent Lee's Declaration show (¶¶ 125-169), each of the items sought by the summons is specifically targeted toward obtaining information that may further the IRS's investigation of the John Doe Class and its members' failure (or potential failure) to comply with the internal revenue laws.  The narrow-tailoring requirement is therefore satisfied.

## IV. CONCLUSION

For the foregoing reasons, the United States' petition to issue the summons should be granted.

Dated this 8th day of August, 2022.

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice